IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

JUL 2 4 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:14-CR-256 |
| | ) | |
| v. | ) | <u>Count 1</u>: 21 U.S.C. §§ 846 & 841(a) |
| | ) | (Conspiracy to Distribute and Dispense |
| NIBEDITA MOHANTY, M.D., | ) | Controlled Substances) |
| | ) | |
| Defendant. | ) | <u>Count 2</u>: 21 U.S.C. § 841(a)-(b) |
| | ) | (Distribution and Dispensation of a Controlled |
| | ) | Substance Resulting in Death) |
| | ) | |
| | ) | <u>Counts 3-4</u>: 21 U.S.C. § 841(a)-(b) |
| | ) | (Distribution and Dispensation of Controlled |
| | ) | Substances Resulting in Serious Bodily Injury) |
| | ) | |
| | ) | <u>Counts 5-42</u>: 21 U.S.C. § 841(a) |
| | ) | (Distribution and Dispensation of Controlled |
| | ) | Substances) |
| | ) | |
| | ) | <u>Counts 43-44</u>: 18 U.S.C. §§ 1347 & 2 |
| | ) | (Aiding and Abetting Health Care Fraud) |
| | ) | |
| | ) | <u>Count 45</u>: 18 U.S.C. §§ 1957 & 2 |
| | ) | (Aiding and Abetting Money Laundering) |
| | ) | |
| | ) | <u>Forfeiture</u>: 21 U.S.C. § 853 |
| | ) | (Forfeiture of Drug Assets) |

**<u>INDICTMENT</u>**

**JULY 2014 TERM — at Alexandria, Virginia**

THE GRAND JURY CHARGES THAT:

## Introduction

1.     Beginning in or about 2008, the defendant, NIBEDITA MOHANTY, M.D. ("DR. MOHANTY"), represented herself as a chronic pain management doctor, whose medical office allowed her to treat the demand of over 100 patients, to whom DR. MOHANTY issued countless prescriptions for excessive dosages of controlled substances, many of which were not for a legitimate medical purpose and beyond the bounds of medical practice. DR. MOHANTY issued a number of prescriptions for controlled substances despite knowledge that patients were abusing, misusing, distributing, or selling the drugs. DR. MOHANTY's dosages resulted in nonfatal overdoses and one death.

## Background on Defendant: Licenses and Pain Practices

2.     DR. MOHANTY was born in July 1958, in Jajpur, India. On or about May 17, 1986, DR. MOHANTY received a medical degree from the Medical College of Virginia, Virginia Commonwealth University in Richmond, Virginia. On or about June 30, 1989, DR. MOHANTY completed her residency in Internal Medicine at Brown University School of Medicine, in Providence, Rhode Island. On or about November 1, 1990, DR. MOHANTY received a license to practice medicine in Virginia. From in or about June 2009 through on or about February 12, 2013, DR. MOHANTY was Chief of Medicine at Stafford Hospital in Stafford, Virginia, within the Eastern District of Virginia.

3.     On or about April 11, 2013, the Virginia Board of Medicine issued an order summarily suspending DR. MOHANTY's license. On September 25, 2013, DR. MOHANTY entered into a Consent Order for the voluntary surrender for suspension of her medical license from the Commonwealth of Virginia for thirty-six months following the date of the entry of the Consent Order.

4.     From in or about 2008 through in or about 2013, in Stafford, Virginia, DR. MOHANTY represented herself to be a chronic pain management practitioner and maintained a pain clinic.

### Distribution of Controlled Substances General Allegations and Terminology

5.     The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensation of controlled substances in the United States. The CSA and the Code of Federal Regulations ("CFR") contain definitions relevant to this Indictment.

6.     The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedules I, II, III, IV, or V, as designated by Title 21, United States Code, Section 802(c)(6), and the CFR.

7.     A prescription for a controlled substance violates the CSA and the relevant CFR(s) if it is issued outside the scope of medical practice or is not for a legitimate medical purpose in the usual course of a professional practice.

8.     The term "Schedule II" means the drug or other substance has a high potential for abuse, has a currently accepted medical use with severe restrictions, and abuse of the drug or other substances may lead to severe psychological or physical dependence.

9.     The term "Schedule III" means the drug or other substance has a potential for abuse less than drugs or other substances in Schedules I or II, has a currently accepted medical use in treatment in the United States, and abuse of the drug may lead to moderate or low physical dependence or high psychological dependence.

10.     The term "Schedule IV" means the drug or other substance has a low potential for abuse relative to the drugs or other substances in Schedule III, a currently accepted medical use in

3

treatment in the United States, and abuse of which may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule III.

11.     The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance.

12.     The term "distribute" means to deliver (other than by prescribing, administering, or dispensing) a controlled substance, including sharing, diverting, or selling tablets to others.

13.     The term "practitioner" means a medical doctor, physician, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he or she practices, to dispense controlled substances in the course of professional practice.

14.     The term "dosage" is the amount, frequency, and number of tablets of controlled substances authorized by a practitioner, who has been issued a DEA registration number.

15.     The term "serious bodily injury" means death, bodily injury which involves a substantial risk of death, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, such as a nonfatal overdose.

16.     The term "early refill" means any prescription issued by a practitioner before the patient's previous prescription should have run out.  For example, if a practitioner prescribes 30 tablets to a patient with written instructions to take one per day, then an early refill would be any prescription issued to that patient before the thirty days has expired.

17.     The term "doctor shopping" refers to when a patient sees multiple practitioners for the illegal purpose of obtaining controlled substances to abuse, distribute, or sell to others.

4

18.     The term "X-ray" refers to a form of diagnostic testing that uses electromagnetic radiation to penetrate structures within the body and create images of those structures to detect abnormalities within the body to diagnose various injuries and/or diseases.

19.     The term "magnetic resonance imaging" ("MRI") refers to a form of diagnostic testing, which uses a magnetic resonance scanner to view the internal structure of the body to diagnose injury and/or disease.

20.     The Drug Enforcement Administration ("DEA") issues registration numbers to qualifying practitioners, who become authorized to dispense Schedule II, III, IV, and V controlled substances.  To be issued and maintain a DEA registration number, a physician or non-physician must be in compliance with all state laws regarding the practice of medicine and the prescribing of medication.

21.     The Virginia Department of Health Professionals ("DHP") is a regulatory agency for the commonwealth of Virginia that licenses health professionals, enforces standards of practices, and provides information to health care practitioners and the public.

22.     Under the Drug Addiction Treatment Act of 2000 ("DATA 2000"), qualified practitioners, under certification by the Department of Health and Human Services ("DHHS"), are allowed to prescribe Food and Drug Administration approved Schedule III, IV, and V controlled substances for narcotic addiction, up to 100 patients per practitioner at any time, outside the context of clinic-based narcotic treatment programs.  In order to prescribe for office-based narcotic buprenorphine treatment, the practitioner must be approved by the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a branch of DHHS, and the DEA.  In order to be approved, a practitioner must be licensed and meet certain criteria republished by DHHS under DATA 2000.

5

23. Upon approval by SAMHSA and DEA for office-based narcotic buprenorphine treatment, the DEA issues the practitioner a special identification number called a "X" DEA number.

24. In order to dispense Schedule III, IV, or V controlled substances for maintenance and detoxification treatment, a physician must write on the prescription their DEA number along with their "X" DEA number.

25. The Virginia Prescription Monitoring Program ("PMP") is maintained by DHP and collects data centrally regarding the prescription of Schedule II, III, and IV controlled substances to deter the illegitimate use of prescription controlled substances.

26. The purpose of a urine drug screen is to determine if the prescribed controlled substances and/or illicit drugs (e.g., cocaine, heroin, and marijuana) are in the urine.

27. "Adderall" is a brand name tablet that contains amphetamine, a Schedule II controlled substance.

28. "Dilaudid" is a brand name tablet that contains hydromorphone, a Schedule II controlled substance.

29. "Fentanyl" is a brand name and a Schedule II controlled substance. It is commonly used for the treatment of pain and as an anesthesia. It is available in the dosage forms of lozenges, transdermal patches, and injectable formulations. The transdermal patches are available in dosages ranging from 25 to 300 micrograms (mcg).

30. "Lorcet" is a brand name tablet that contains acetaminophen and hydrocodone, a Schedule III controlled substance.

31.     "Methadone" is a generic tablet that contains methadone hydrochloride, a Schedule II controlled substance.

32.     "Morphine" is a Schedule II controlled substance whose active ingredient is morphine. It is available in generic form and under brand names including Morphine Sulfate Immediate Release, also known as "MSIR" and "MS Contin."

33.     "Opana IR" and "Opana ER" are brand name tablets that contain oxymorphone, a Schedule II controlled substance.

34.     "Oxycodone," which is also known as "Oxy," is an opioid pain medication and a Schedule II controlled substance whose active ingredient is oxycodone. It is available in generic form and under brand names including "OxyContin," "Percocet," "Roxicodone," "Roxicet," and "Endocet."

35.     OxyContin, which is a brand name tablet designed, manufactured, and promoted by Purdue Pharma to be a safer and less abusable drug for the treatment of chronic pain, is an analgesic-narcotic that contains oxycodone, a Schedule II controlled substance. Introduced to the market in 1996, OxyContin pills are sold in dosages of 20 milligrams, 40 milligrams, and 80 milligrams.

36.     Demand for oxycodone has grown to epidemic proportions in many parts of the United States, including Northern Virginia, where drug dealers can sell pills containing oxycodone for $1 per mg or more.

37.     Oxycodone and other Schedule II controlled substances have a high potential for abuse and can be crushed and snorted or dissolved and injected to get an immediate high. This abuse can lead to addiction, overdose, and death.

38. "Buprenorphine" is a Schedule III controlled substance. It is available in generic form and under brand names including "Suboxone" and "Subutex," which are intended for the treatment of opioid addiction or dependence.

39. "Alprazolam" is a depressant and a Schedule IV controlled substance. It is part of the benzodiazepine class of drugs, and it is commonly used for the treatment of anxiety. It is available in generic form and under the brand name "Xanax."

40. "Ambien" is a brand name tablet, commonly used for the treatment of insomnia, which contains zolpidem, a Schedule IV controlled substance.

41. "Klonopin" is a brand name tablet, commonly used for the treatment of seizures and panic attacks that contains clonazepam, a Schedule IV controlled substance. It is part of the benzodiazepine class of drugs.

42. "Valium" is a brand name tablet that contains diazepam, a Schedule IV controlled substance.

<u>Health Care Fraud General Allegations and Terminology</u>

43. Section 24(b) of Title 18, United States Code, defines a "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

44. Anthem Blue Cross Blue Shield ("Anthem") is a private health care insurance provider that provides insurance contracts and plans, affecting interstate commerce, under which medical benefits, items, and services are provided to individuals.

## Count One
### (Conspiracy to Distribute and Dispense Controlled Substances)

THE GRAND JURY FURTHER CHARGES THAT:

45.     The allegations set forth in paragraphs 2-44 of this Indictment are incorporated herein by reference.

46.     From in about 2008 through in or about February 2013, in the Eastern District of Virginia and elsewhere, the defendant, NIBEDITA MOHANTY, M.D., did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree together with patients Mr. C.A., Ms. C.A., C.B., A.C., D.C., A.G., P.H., K.K., R.K., J.L., Mr. M.M., Ms. M.M., C.P., M.P., A.S., K.S., M.S., D.W., T.W., and V.W., and with others known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of the following controlled substances, including, but not limited to, alprazolam, amphetamine, buprenorphine, clonazepam, diazepam, fentanyl, hydrocodone, hydromorphone, morphine, oxycodone, and oxymorphone not for a legitimate medical purpose and beyond the bounds of medical practice, in violation of Title 21, United States Code, Section 841(a)(1).

47.     Death and serious bodily injury (nonfatal overdoses) resulted from the use of the controlled substances so distributed.

## Nature and Purpose of the Conspiracy

The purposes of the conspiracy included, but were not limited to, the following:

48.     To make as much money as possible by distributing and dispensing controlled substances including, but not limited to, alprazolam, amphetamine, buprenorphine, clonazepam, diazepam, fentanyl, hydrocodone, hydromorphone, morphine, oxycodone, and oxymorphone to patients, other drug users, and conspirators.

49.     To facilitate the re-distribution of controlled substances, including, but not limited to, alprazolam, amphetamine, buprenorphine, clonazepam, diazepam, fentanyl, hydrocodone, hydromorphone, oxycodone, and oxymorphone to other drug users.

50.     To satisfy the demand for illegal distribution, sale, and consumption of controlled substances, including, but not limited to, alprazolam, amphetamine, buprenorphine, clonazepam, diazepam, fentanyl, hydrocodone, hydromorphone, oxycodone, and oxymorphone in the Northern Virginia area and elsewhere.

## Ways, Manners, and Means of the Conspiracy

51.     In furtherance of this conspiracy and to effect and accomplish the objects of it, DR. MOHANTY distributed, dispensed, and aided and abetted the distribution and dispensation of controlled substances, including, but not limited to, alprazolam, amphetamine, buprenorphine, clonazepam, diazepam, fentanyl, hydrocodone, hydromorphone, oxycodone, and oxymorphone.

52.     During the course and in furtherance of the conspiracy, DR. MOHANTY prescribed excessive amounts of controlled substances to patients, including conspirator patients, thereby causing, aiding, abetting, and facilitating the misuse, abuse, addiction, and subsequent distribution of these controlled substances.

53.     During the course and in furtherance of the conspiracy, DR. MOHANTY prescribed excessive amounts of controlled substances and acted with actual knowledge, willful blindness, and deliberate ignorance that these controlled substances were being further distributed, diverted, and abused by her conspirator patients and others.

54.     During the course and in furtherance of the conspiracy, conspirator patients acquired large quantities of controlled substances from DR. MOHANTY for personal use and distribution.

55.     During the course and in furtherance of the conspiracy, conspirator patients distributed controlled substances obtained from DR. MOHANTY to DR. MOHANTY patients and others for personal use and subsequent distribution.

56.     During the course and in furtherance of the conspiracy, conspirator patients R.K. and K.K. ran a pill distribution ring, wherein they distributed controlled substances obtained from DR. MOHANTY for a profit.

57.     During the course and in furtherance of the conspiracy, R.K. recruited conspirator patients to see DR. MOHANTY to obtain controlled substances from DR. MOHANTY, after which R.K. would purchase their pills and, later, divert or resell to others. The patients whom R.K. referred to DR. MOHANTY included, but were not limited, to C.A., C.B., A.C., C.P., M.P., and D.W.

58.     During the course and in furtherance of the conspiracy, patients and conspirator patients visited DR. MOHANTY's medical practice in Stafford, Virginia, on at least a monthly basis for the purpose of obtaining, abusing, diverting, and distributing large quantities of prescription controlled substances.

59.     During the course and in furtherance of the conspiracy, patients and conspirator patients received early refills of prescription controlled substances from DR. MOHANTY on numerous occasions.

60.     During the course and in furtherance of the conspiracy, DR. MOHANTY aided, abetted, and facilitated patients' and conspirator patients' efforts to defraud health care companies and benefit programs into reimbursing the cost of filling prescriptions she issued not for a legitimate medical purpose and beyond the bounds of medical practice.

61.     During the course and in furtherance of the conspiracy, at the first appointment, DR. MOHANTY frequently prescribed controlled substances to patients and conspirator patients without reviewing or obtaining prior medical records to verify the claimed illness or condition.

62.     During the course and in furtherance of the conspiracy, DR. MOHANTY rapidly and randomly increased the dosages of controlled substances prescribed with knowledge, willful blindness, and deliberate ignorance that the use of these amounts would result in addiction, abuse, diversion, and distribution.

63.     During the course and in furtherance of the conspiracy, DR. MOHANTY rapidly and randomly increased the dosages of controlled substances prescribed, thereby requiring the patients and conspirator patients to return frequently to DR. MOHANTY to obtain excessive amounts of these controlled substances and insuring their payment for each visit, for which DR. MOHANTY charged them up to $250.

64.     During the course and in furtherance of the conspiracy, DR. MOHANTY acquired large amounts of cash as remuneration from her patients and conspirator patients for patients' visits to DR. MOHANTY.  On DR. MOHANTY's 2007, 2011, and 2012 Forms 1040, her adjusted gross income was $7,811, $119,021, and $255,283, respectively.  Such cash payments supported DR.

12

MOHANTY's lavish lifestyle, which included, but were not limited to, a swimming pool, for which she paid approximately $32,000 in cash in numerous denominations stuffed in envelopes, and the maintenance of a large home.

65. During the course and in furtherance of the conspiracy, DR. MOHANTY rarely, if ever, counseled her patients regarding alternative treatments, such as physical therapy, psychological or addiction counseling, or surgery.

66. During the course and in furtherance of the conspiracy, DR. MOHANTY frequently issued prescriptions for controlled substances to patients and conspirator patients despite obvious indications ("red flags") that such patients and conspirators were abusing, misusing, and distributing the controlled substances she prescribed, including, but not limited to, the following: frequent excuses by patients describing lost or stolen prescriptions; urine drug screens showing negative results for the controlled substances prescribed (indicating likely distribution for the medications prescribed); urine drug screens and blood tests that showed the patient tested positive for illicit narcotics (indicating substance abuse); track and ulcer marks found on patients' arms and hands (indicating use of intravenous injections); patients' self-reports of history of addiction; patients' self-reports of arrests for driving while under the influence (indicating substance abuse problems); patients' self-reports of arrests for various drug crimes; patients self-reports that they were not taking medication as prescribed; PMP reports showing that patients filled controlled substances prescriptions written by multiple practitioners (indicating doctor shopping); patients unverified claims of allergies to tamper-proof medications, thereby requiring DR. MOHANTY to prescribe controlled substances that were not tamper proof; and numerous phone calls from individuals claiming that DR. MOHANTY's patients and

conspirator patients were distributing or abusing the controlled substances prescribed by DR. MOHANTY.

67.     During the course and in furtherance of the conspiracy, DR. MOHANTY continued to prescribe excessive amounts of controlled substances knowing that these distributions have resulted in numerous overdoses, and, in some cases, death to her patients, including, but not limited to, V.W. (died June 1, 2011).

68.     During the course and in furtherance of the conspiracy, DR. MOHANTY and conspirator patients obtained substantial income and resources from their illegal distribution of controlled substances.

69.     During the course and in furtherance of the conspiracy, DR. MOHANTY made false and misleading statements to conceal her illegal activity about her prescription practices and conduct to regulatory authorities and law enforcement, including, but not limited to, DHP, the Federal Bureau of Investigation, and pharmacists.

70.     During the course and in furtherance of the conspiracy, DR. MOHANTY did not possess an "X" DEA Number to write prescriptions for Subutex and Suboxone for office-based narcotic buprenorphine treatment.

<u>Overt Acts in Furtherance of the Conspiracy</u>

In furtherance of the conspiracy and to effect and accomplish the objects thereof, DR. MOHANTY and her conspirator patients committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

71.     On or about October 30, 2009, in Stafford, Virginia, a search of conspirator patient Ms. C.A.'s PMP was run, revealing that from on or about August 30, 2008 through on or about June

11, 2009, Ms. C.A. received prescriptions for controlled substances from approximately nine different practitioners.

72.     On or about December 30, 2009, in Stafford, Virginia, DR. MOHANTY's patient file for Ms. C.A. noted that Ms. C.A. had been "popping pain pills like candy."

73.     On or about March 12, 2010, in Stafford, Virginia, DR. MOHANTY's patient file for Ms. C.A. noted that Ms. C.A. said that she needed a higher dosage of OxyContin. On or about March 12, 2010, DR. MOHANTY prescribed double the amount of OxyContin 80 mg prescribed at Ms. C.A.'s previous appointment on or about February 26, 2010.

74.     On or about July 24, 2010, in Fredericksburg, Virginia, within the Eastern District of Virginia, Ms. C.A. was admitted to Mary Washington Hospital, and the admitting physician wrote that Ms. C.A. "had been abusing some pain medications."

75.     On or about October 21, 2010, Ms. C.A. called to report that she went to jail last weekend for driving on a suspended license. Ms. C.A. also reported that her medication had been stolen and that DR. MOHANTY forgot her Percocet script at her previous appointment.

76.     On or about December 13, 2010, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 150 Dilaudid 8 mg tablets, 10 Fentanyl 100 mcg patches, 200 MS Contin 100 mg tablets, 300 Opana ER 40 mg tablets, 400 Opana IR 10 mg tablets, 120 Percocet 10 mg tablets, and 500 Roxicodone 30 mg tablets to Ms. C.A.

77.     On or about May 2, 2011, in Stafford, Virginia, DR. MOHANTY's patient file for Ms. C.A. noted that Ms. C.A. was going to jail for three days for driving on a suspended license.

78.     In or about December 2011, in Stafford, Virginia, DR. MOHANTY received a document from United Health Care Prescription Solutions Misuse and Abuse Drug Monitoring Program notifying DR. MOHANTY that Ms. C.A.'s filling practices could be evidence that Ms. C.A. was misusing and/or abusing prescription controlled substances based on: (1) Ms. C.A.'s high daily

dose of opioids and (2) continuous overlapping use of two or more extended release-opioid analgesics for at least forty-five days.

79. On or about June 6, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 340 Methadone 10 mg tablets and 360 oxycodone 30 mg tablets to conspirator patient Mr. C.A.

80. On or about August 19, 2011, in Stafford, Virginia, DR. MOHANTY's patient file for Mr. C.A. noted that an assault led to jail time.

81. On or about August 19, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 340 Methadone 10 mg tablets and 360 oxycodone 30 mg tablets to Mr. C.A.

82. On or about November 18, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 245 Methadone 10 mg tablets and 360 oxycodone 30 mg tablets to Mr. C.A., and in addition, prescribed 30 Xanax 2 mg tablets to Mr. C.A.

83. On or about December 3, 2010, in Stafford, Virginia, at conspirator patient C.B.'s first appointment with DR. MOHANTY, DR. MOHANTY prescribed 360 oxycodone 30 mg tablets and 90 Xanax 2 mg tablets to C.B.

84. On or about January 6, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 400 oxycodone 30 mg tablets and 90 Xanax 2 mg tablets to C.B.

85. On or about January 6, 2011, a pharmacist from Wegmans called to verify the quantity of oxycodone because he/she had run C.B.'s PMP, had discovered that C.B. had only been prescribed controlled substances since being seen in DR. MOHANTY's office, and had wanted to know why DR. MOHANTY was prescribing such a high quantity of controlled substances to C.B.

86. On or about January 19, 2011, in Stafford, Virginia, a search of C.B.'s PMP was run, revealing that C.B. had never received oxycodone prior to seeing DR. MOHANTY.

16

87.     On or about February 4, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 400 oxycodone 30 mg tablets and 90 Xanax 2 mg tablets to C.B.

88.     On or about June 15, 2011, in Stafford, Virginia, DR. MOHANTY prescribed an early refill of 400 oxycodone 30 mg tablets to C.B.

89.     On or about December 23, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 60 Dilaudid 8 mg tablets and 360 oxycodone 30 mg tablets to C.B.

90.     On or about December 10, 2010, in Stafford, Virginia, at conspirator patient A.C.'s first appointment with DR. MOHANTY, DR. MOHANTY prescribed 360 Dilaudid 8 mg tablets and 360 oxycodone 30 mg tablets to A.C.

91.     On or about August 1, 2011, in Stafford, Virginia, a search of A.C.'s PMP was run, revealing that A.C. had never taken oxycodone or Dilaudid prior to seeing DR. MOHANTY.

92.     On or about August 16, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 340 Dilaudid 8 mg tablets and 360 oxycodone 30 mg tablets to A.C.

93.     On or about October 3, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 340 Dilaudid 8 mg tablets, 360 oxycodone 30 mg tablets, and 60 Xanax 2 mg tablets to A.C.

94.     On or about November 20, 2008, in Stafford, Virginia, at conspirator patient D.C.'s first appointment with DR. MOHANTY, D.C. identified himself as a heroin addict, who last used on November 15, 2008, and received from DR. MOHANTY prescriptions for 60 Subutex 8 mg tablets and 30 Xanax .25 mg tablets.

95.     On or about August 31, 2012, in Stafford, Virginia, DR. MOHANTY prescribed 90 Klonopin 2 mg tablets, 90 Subutex 8 mg tablets, and 120 Xanax 1 mg tablets to D.C.

96.     On or about October 25, 2009, in Stafford, Virginia, Dan's Wellness Pharmacy contacted DR. MOHANTY's office about a 60 Subutex 8 mg tablets prescription for conspirator patient

T.W. stating that "on Rx it must say as needed for pain since Dr. DR. MOHANTY doesn't have a X DEA #." DR. MOHANTY acknowledged receipt of that information by writing "Done" and adding the word "pain" to that prescription.

97.    On or about July 6, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 60 Klonopin 1 mg tablets, 90 Subutex 8 mg tablets with a notation of "severe pain," and 60 Xanax 1 mg tablets to T.W.

98.    On or about November 18, 2009, in Stafford, Virginia, DR. MOHANTY aided and abetted D.C.'s submission of a false health care claim to Anthem.

99.    On or about August 2, 2010, in Stafford, Virginia, DR. MOHANTY aided and abetted D.C.'s submission of a false health care claim to Anthem.

100.    On or about April 14, 2011, in Stafford, Virginia, conspirator patient J.L. was convicted and incarcerated for Selling or Providing Schedule I or II Controlled Substances for Resale in Stafford County Circuit Court.

101.    On or about December 19, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 360 oxycodone 30 mg tablets to J.L.

102.    On or about January 27, 2012, in Stafford, Virginia, conspirator patient A.G. had a urine drug screen performed in DR. MOHANTY's office, which was negative.

103.    On or about February 22, 2012, in Stafford, Virginia, DR. MOHANTY prescribed 320 oxycodone 30 mg tablets to A.G.

104.    On or about May 21, 2012, an anonymous phone call was made to DR. MOHANTY's office stating that the caller saw J.L. and A.G. selling their pain medication.

105.    On or about May 31, 2012, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 150 Dilaudid 8 mg tablets and 360 oxycodone 30 mg tablets to A.G.

18

106. On or about June 13, 2012, in Stafford, Virginia, DR. MOHANTY's patient file for J.L. noted that J.L.'s blood pressure was elevated due to him running out of his medications yesterday, yet DR. MOHANTY prescribed early refills of 250 oxycodone 15 mg tablets, 400 oxycodone 30 mg tablets, and 60 Xanax 1 mg tablets to J.L.

107. On or about August 13, 2012, in Stafford, Virginia, J.L. was arrested and charged with Possession of a Schedule I or II Controlled Substance.

108. On or about August 14, 2012, in Stafford, Virginia, DR. MOHANTY learned of J.L.'s pending charges after receiving a fax from Rappahannock Regional Jail requesting J.L.'s health records. On or about August 23, 2012, DR. MOHANTY sent J.L. a letter discharging him from her practice stating, "I will not be able to provide medical services to you until your current court case regarding controlled substances is dismissed or you are found not guilty."

109. On or about August 21, 2012, an anonymous call was made to DR. MOHANTY's office stating that J.L. was in jail for selling controlled substances, and A.G. would try to be seen early by DR. MOHANTY in order to be prescribed controlled substances to be distributed to raise funds for J.L.'s bond.

110. On or about September 10, 2012, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 150 Dilaudid 8 mg tablets and 300 oxycodone 30 mg tablets to A.G.

111. On or about January 11, 2013, in Stafford, Virginia, DR. MOHANTY prescribed 60 alprazolam 1 mg tablets, 200 Dilaudid 8 mg tablets, 40 oxycodone 15 mg tablets, and 325 oxycodone 30 mg tablets to A.G.

112. On or about January 14, 2013, in Stafford, Virginia, DR. MOHANTY prescribed J.L. 100 Dilaudid 8 mg tablets, 200 oxycodone 15 mg tablets, 300 oxycodone 30 mg tablets, and 60 Xanax 2 mg tablets, after receiving a letter from J.L.'s defense counsel stating that the drug

trafficking charges against J.L. were nolle prossed on October 16, 2012 in the Stafford County General District Court.

113. On or about June 8, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 10 Fentanyl 50 mcg patches, 120 Dilaudid 8 mg tablets, and 450 oxycodone 30 mg tablets to conspirator patient P.H.

114. On or about August 30, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 120 Dilaudid 8 mg tablets, 360 oxycodone 15 mg tablets, and 500 oxycodone 30 mg tablets to P.H.

115. On or about May 25, 2012, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 120 Dilaudid 8 mg tablets, 120 MS Contin 100 mg tablets, 360 oxycodone 30 mg tablets, and 60 Xanax 2 mg tablets to P.H.

116. On or about May 25, 2012, in Stafford, Virginia, P.H. was arrested by Stafford County police officers for selling/providing for resale of oxycodone and Dilaudid.

117. On or about May 31, 2012, in Stafford, Virginia, a letter of dismissal from DR. MOHANTY's practice addressed to P.H. was drafted based on information received from the Stafford County Court System, which contained the following handwritten note: "Wait on this."

118. On or about June 19, 2012, in Stafford, Virginia, DR. MOHANTY prescribed 150 Dilaudid 8 mg tablets, 120 MS Contin 100 mg tablets, and 360 oxycodone 30 mg tablets to P.H.

119. On or about July 16, 2012, in Stafford, Virginia, DR. MOHANTY prescribed 150 Dilaudid 8 mg tablets, 120 MS Contin 15 mg tablets, 120 MS Contin 60 mg tablets, and 360 oxycodone 30 mg tablets to P.H.

120. On or about February 2, 2010, in Stafford, Virginia, DR. MOHANTY prescribed 90 alprazolam 2 mg tablets, 30 Ambien 10 mg tablets, and 180 oxycodone 30 mg tablets to conspirator patient K.K.

121.    On or about August 9, 2010, in Stafford, Virginia, K.K. complained to DR. MOHANTY that his medication had been stolen, and as a result, DR. MOHANTY prescribed early refills of 360 oxycodone 30 mg tablets to K.K.  In addition, DR. MOHANTY prescribed 90 alprazolam 2 mg tablets to K.K.

122.    On or about August 29, 2011, in Stafford, Virginia, DR. MOHANTY prescribed an early refill of 450 oxycodone 30 mg tablets to K.K.

123.    On or about November 17, 2011, in Stafford, Virginia, DR. MOHANTY prescribed an early refill of 450 oxycodone 30 mg tablets to K.K.

124.    On or about November 4, 2010, in Stafford, Virginia, DR. MOHANTY's file for conspirator patient R.K. noted that R.K. would like a refill of her medication 10 days early, and as a result, DR. MOHANTY prescribed early refills of 360 oxycodone 30 mg tablets to R.K.  In addition, DR. MOHANTY prescribed 30 Dilaudid 8 mg tablets to R.K.

125.    On or about August 26, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 360 Dilaudid 8 mg tablets, 10 Fentanyl 100 mcg patches, 30 Opana ER 40 mg tablets, 360 oxycodone 15 mg tablets, 360 oxycodone 20 mg tablets, and 450 oxycodone 30 mg tablets to R.K.

126.    On or about December 9, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 400 Dilaudid 8 mg tablets, 360 oxycodone 20 mg tablets, 450 oxycodone 30 mg tablets, and 30 Opana ER 20 mg tablets to R.K.

127.    On or about May 12, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 30 Adderall 30 mg tablets and 360 oxycodone 30 mg tablets to conspirator patient Mr. M.M.

128.    On or about March 7, 2012, in Stafford, Virginia, DR. MOHANTY prescribed 30 Adderall 30 mg tablets and 320 oxycodone 30 mg tablets to Mr. M.M.

129. On or about July 28, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 100 Dilaudid 8 mg tablets and 425 oxycodone 30 mg tablets to conspirator patient Ms. M.M.

130. On or about March 20, 2012, in Stafford, Virginia, DR. MOHANTY's office faxed Ms. M.M.'s patient file to Dr. B.S. On or about March 22, 2012, Dr. B.S.'s office wrote DR. MOHANTY a note, received by DR. MOHANTY via facsimile on or about March 23, 2012, stating that Ms. M.M. is on a "higher level of narcotics than we are comfortable prescribing but will be happy to evaluate her for other treatment options."

131. On or about August 7, 2012, in Stafford Virginia, DR. MOHANTY prescribed 200 Dilaudid 8 mg tablets, 130 oxycodone 30 mg tablets, and 170 oxycodone 30 mg tablets to Ms. M.M.

132. On or about November 4, 2010, in Stafford, Virginia, DR. MOHANTY prescribed 360 oxycodone 30 mg tablets to conspirator patient C.P. At that appointment, C.P. told DR. MOHANTY that K.K. smashed her husband's windshield looking for his controlled substances prescriptions.

133. On or about April 8, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 90 Dilaudid 8 mg tablets, 10 Fentanyl 75 mcg patches, and 360 oxycodone 30 mg tablets to C.P.

134. On or about June 16, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 120 Dilaudid 8 mg tablets and 400 oxycodone 30 mg tablets to conspirator patient M.P. with a notation "Ok to fill early."

135. On or about November 15, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 120 Dilaudid 8 mg tablets, 400 oxycodone 30 mg tablets, and 60 Xanax 1 mg tablets to M.P.

136. On or about April 19, 2010, a pharmacist from CVS called DR. MOHANTY's office and reported: (1) that conspirator patient A.S. came in on Sunday, April 14, 2010, with an additional oxycodone script claiming that the prior one was stolen and (2) that A.S. stated she was taking eighteen to twenty oxycodone tablets per day.

137. On or about September 6, 2010, in Stafford, Virginia, a pharmacist from Dan's Pharmacy called and reported that A.S., along with two other DR. MOHANTY patients, claimed the pharmacy shorted them on their pain medication. The pharmacist indicated that the count was correct on the medication because two technicians always count that type and quantity of medication along with a camera watching.

138. On or about December 20, 2010, in Locust Grove, Virginia, CVS Pharmacy called DR. MOHANTY's office and reported that A.S. was filling too many Opana scripts too early as there had been two to three scripts per month.

139. On or about October 3, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 10 Fentanyl 100 mcg patches, 150 oxycodone 10 mg tablets, 300 oxycodone 15 mg tablets, 500 oxycodone 30 mg tablets, and 120 Percocet 10 mg tablets to A.S.

140. On or about October 12, 2011, in Fredericksburg, Virginia, within the Eastern District of Virginia, A.S. was admitted to Mary Washington Hospital for an unresponsive event due to medications. On or about December 21, 2011, the records from Mary Washington Hospital regarding the October 12, 2011 admission were faxed to DR. MOHANTY's office and are contained in DR. MOHANTY's patient file for A.S.

141. On or about October 21, 2011, in Stafford, Virginia, at a visit listed on DR. MOHANTY's visit notes as a follow-up from the hospital visit, DR. MOHANTY prescribed 180

Dilaudid 8 mg tablets, 10 Fentanyl 100 mcg patches, 500 oxycodone 30 mg tablets, and 120 Valium 10 mg tablets to A.S.

142. On December 28, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 150 Dilaudid 8 mg tablets, 225 oxycodone 10 mg tablets, 300 oxycodone 15 mg tablets, 500 oxycodone 30 mg tablets, 120 Valium 10 mg tablets, and 90 Xanax 2 mg tablets to A.S.

143. On October 1, 2010, in Stafford, Virginia, DR. MOHANTY prescribed 60 Opana ER 40 mg tablets and 360 oxycodone 30 mg tablets to conspirator patient K.S.

144. On October 21, 2010, in Stafford, Virginia, K.S. stopped by DR. MOHANTY's office seeking a replacement prescription because, as K.S. claimed, his insurance would not pay for the oxycodone and he lost the prescription.

145. On or about October 25, 2010, in Stafford, Virginia, a search of K.S.'s PMP, contained in DR. MOHANTY's patient file for K.S., was run, revealing that on or about October 1, 2010, K.S. filled the October 1, 2010 prescription for 360 oxycodone 30 mg tablets.

146. On or about October 26, 2010, in Stafford, Virginia, a discharge letter was written and mailed to K.S. stating that DR. MOHANTY cannot continue to see K.S. based on "information from prescription monitoring program."

147. On or about November 23, 2010, in Stafford, Virginia, DR. MOHANTY prescribed 60 Opana ER 40 mg tablets and 360 oxycodone 30 mg tablets to K.S.

148. On or about August 29, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 10 Fentanyl 25 mcg patches, 60 Opana ER 40 mg tablets, and 360 oxycodone 30 mg tablets to K.S.

149.    On or about October 23, 2010, in Fredericksburg, Virginia, conspirator patient M.S. was admitted to Mary Washington Hospital for suicidal ideation as the patient was having vocal hallucinations telling her to kill herself. M.S.'s urine drug screen contained cocaine metabolites. On or about October 24, 2010, DR. MOHANTY's office received a fax of the records from M.S.'s admission to Mary Washington Hospital, which is contained in DR. MOHANTY's patient file of M.S.

150.    On or about October 27, 2010, in Stafford, Virginia, M.S. came to DR. MOHANTY's office and spoke to a member of the office staff. M.S. aggressively requested an oxycodone script claiming that DR. MOHANTY told her to take two extra oxycodone tablets a day. DR. MOHANTY then prescribed an early refill of 72 oxycodone 30 mg tablets to M.S.

151.    On or about November 1, 2010, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 60 Dilaudid 8 mg tablets, 360 oxycodone 30 mg tablets, and 60 Xanax 2 mg tablets to M.S.

152.    On or about October 26, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 120 Dilaudid 4 mg tablets, 400 oxycodone 30 mg tablets, and 60 Xanax 2 mg tablets to M.S.

153.    On or about February 2, 2011, in Stafford, Virginia, Dan's Pharmacy called DR. MOHANTY's office and informed them that based on D.W.'s PMP, D.W. had no history of being on a high dose of narcotics.

154.    On or about December 20, 2011, in Stafford, Virginia, DR. MOHANTY prescribed early refills of 300 Dilaudid 8 mg tablets and 300 oxycodone 30 mg tablets to D.W. with a notation of "ok to fill early – pt is traveling."

155. On or about February 2, 2010, in Stafford, Virginia, a letter was faxed and received by DR. MOHANTY from Doctor R.D., which is contained in conspirator patient V.W.'s patient file and initialed by DR. MOHANTY. This letter stated that: (1) V.W. was only getting Lorcet tablets three times a day from DR. MOHANTY; (2) from January 27 through February 1, she was psychiatrically admitted to Snowden; (3) the Snowden admission followed what seemed to be an involuntary overdose of various narcotics and barbiturates while visiting a friend in Los Angeles, California on January 1; and (4) the purpose of the letter was to notify all of V.W.'s physicians of her history with narcotic addiction, overdose, and attempts at detoxification and rehabilitation in order to "coordinate care and to protect [V.W.] from her own potential for polypharmacy from multiple providers" because V.W. "does not want to do this and she wants us to help avoid the temptation to do so."

156. On or about March 5, 2010, in Stafford, Virginia, DR. MOHANTY prescribed 90 OxyContin 60 mg tablets and 100 Percocet 10 mg tablets to V.W.

157. On or about May 2, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 60 Dilaudid 8 mg tablets, 380 oxycodone 30 mg tablets, and 60 OxyContin 80 mg tablets to V.W.

158. On or about May 19, 2011, V.W. consumed a portion of the oxycodone distributed and dispensed by DR. MOHANTY, which caused V.W. to have a nonfatal overdose. At that time, V.W. told the physician at Mary Washington Hospital that "she was taking oxycodone, but did not take any narcotics in the last 2 months, but this morning she was complaining of some pain, took 2 oxycodone."

159. On or about May 20, 2011, in Fredericksburg, Virginia, DR. MOHANTY visited V.W. at Mary Washington Hospital and discharged her.

160.   On or about May 31, 2011, in Stafford, Virginia, DR. MOHANTY prescribed 60 Dilaudid 8 mg tablets, 380 oxycodone 30 mg tablets, and 60 OxyContin 80 mg tablets to V.W.

161.   On or about June 1, 2011, in Westmoreland County, Virginia, within the Eastern District of Virginia, V.W. consumed a portion of the oxycodone distributed and dispensed by DR. MOHANTY, which caused V.W.'s death.

162.   On or about October 26, 2011, in Stafford, Virginia, DR. MOHANTY billed V.W. $199.00 for her services at the May 20, 2011 discharge from Mary Washington Hospital.

163.   On or about February 1, 2013, in Stafford, Virginia, in an interview with H.K. from the DHP, DR. MOHANTY falsely stated that she had not seen V.W. in the Stafford Hospital emergency room shortly before V.W.'s death.

164.   On or about October 22, 2010, in Stafford, Virginia, non-conspirator pharmacist D.S. from Dan's Wellness Pharmacy provided DR. MOHANTY with a doctor drug monitoring report from August and September of 2010, listing each time one of her patients filled a prescription at Dan's Wellness Pharmacy in that time period. The reports included 109 prescriptions from thirty of DR. MOHANTY's patients. In a cover letter directed to DR. MOHANTY, pharmacist D.S. stated: "After reviewing the following pages, please sign below confirming that these patients are being treated by you for their pain and you wrote the prescriptions for these patients for the purpose of pain management." DR. MOHANTY signed the document.

165.   In or about June 2011, in Stafford, Virginia, DR. MOHANTY made a cash payment to non-conspirator M.B., the owner of a swimming pool installation company, in the sum of $16,000, in return for M.B.'s installation of a swimming pool on DR. MOHANTY's property. The cash was in numerous denominations and stuffed in envelopes. The total cost of the swimming pool was approximately $45,000.

166.  In or about July 2011, in Stafford, Virginia, DR. MOHANTY made a second cash payment of $16,000, in numerous denominations stuffed in envelopes, to M.B. in return for services rendered by M.B. for the installation of a swimming pool on DR. MOHANTY's property.

(In violation of Title 21, United States Code, Sections 846 and 841(a).)

## Count Two
### (Distribution and Dispensation of a Controlled Substance Resulting in Death)

THE GRAND JURY FURTHER CHARGES THAT:

167.    The allegations set forth in paragraphs 2 through 166 of this Indictment are incorporated herein by reference.

168.    On or about May 31, 2011, in Stafford County, Virginia, within the Eastern District of Virginia, the defendant, NIBEDITA MOHANTY, M.D., did unlawfully, knowingly, and intentionally distribute and dispense a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and beyond the bounds of medical practice, to V.W.

169.    Death resulted from the use of the substance so distributed.

(In violation of Title 21, United States Code, Section 841(a)-(b).)

## Count Three
### (Distribution and Dispensation of Controlled Substances Resulting in Serious Bodily Injury)

THE GRAND JURY FURTHER CHARGES THAT:

170.    The allegations set forth in paragraphs 2 through 169 of this Indictment are incorporated herein by reference.

171.    On or about May 2, 2011, in Stafford County, Virginia, within the Eastern District of Virginia, the defendant, NIBEDITA MOHANTY, M.D., did unlawfully, knowingly, and intentionally distribute and dispense a mixture and substance containing a detectable amount of oxycodone and hydromorphone, Schedule II controlled substances, not for a legitimate medical purpose and beyond the bounds of medical practice, to V.W.

172.    Serious bodily injury (nonfatal overdose) resulted from the use of the substances so distributed.

(In violation of Title 21, United States Code, Section 841(a)-(b).)

**Count Four**
**(Distribution and Dispensation of Controlled Substances**
**Resulting in Serious Bodily Injury)**

THE GRAND JURY FURTHER CHARGES THAT:

173.    The allegations set forth in paragraphs 2 through 172 of this Indictment are incorporated herein by reference.

174.    On or about October 3, 2011, in Stafford County, Virginia, within the Eastern District of Virginia, the defendant, NIBEDITA MOHANTY, M.D., did unlawfully, knowingly, and intentionally distribute and dispense a mixture and substance containing a detectable amount of oxycodone and Fentanyl, Schedule II controlled substances, not for a legitimate medical purpose and beyond the bounds of medical practice, to A.S.

175.    Serious bodily injury (nonfatal overdose) resulted from the use of the substances so distributed.

    (In violation of Title 21, United States Code, Section 841(a)-(b).)

**Counts Five – Forty-Two**
**(Distribution and Dispensation of Controlled Substances)**

THE GRAND JURY FURTHER CHARGES THAT:

176. The allegations set forth in paragraphs 2 through 175 of this Indictment are incorporated herein by reference.

177. On or about the below-listed dates, within the Eastern District of Virginia, the defendant, NIBEDITA MOHANTY, M.D., did unlawfully, knowingly, and intentionally distribute and dispense a mixture and substance containing the below-listed controlled substances, not for a legitimate medical purpose and beyond the bounds of medical practice, to the following:

| Count | Date | Patient | Controlled Substance and Amount | Schedule |
|---|---|---|---|---|
| 5 | 6/6/2011 | Mr. C.A. | Oxycodone 30 mg – 360 tablets | II |
| 6 | 11/18/2011 | Mr. C.A. | Oxycodone 30 mg – 360 tablets | II |
| 7 | 12/13/2010 | Ms. C.A. | Roxicodone 30 mg – 500 tablets | II |
| 8 | 11/29/2011 | Ms. C.A. | Oxycodone 30 mg – 450 tablets | II |
| 9 | 6/15/2011 | C.B. | Oxycodone 30 mg – 400 tablets | II |
| 10 | 12/23/2011 | C.B. | Oxycodone 30 mg – 360 tablets | II |
| 11 | 1/10/11 | A.C. | Oxycodone 30 mg – 360 tablets | II |
| 12 | 10/3/2011 | A.C. | Oxycodone 30 mg – 360 tablets | II |
| 13 | 8/31/2012 | D.C. | Subutex 8 mg – 90 tablets | III |
| 14 | 12/31/2010 | S.C. | Oxycodone 30 mg – 360 tablets | II |
| 15 | 8/3/2012 | S.C. | Dilaudid 2 mg – 180 tablets | II |
| 16 | 9/10/2012 | A.G. | Oxycodone 30 mg – 300 tablets | II |
| 17 | 1/11/2013 | A.G. | Oxycodone 30 mg – 325 tablets | II |
| 18 | 6/8/2011 | P.H. | Oxycodone 30 mg – 450 tablets | II |
| 19 | 5/25/2012 | P.H. | Oxycodone 30 mg – 360 tablets | II |
| 20 | 7/16/2012 | P.H. | Oxycodone 30 mg – 360 tablets | II |
| 21 | 8/29/2011 | K.K. | Oxycodone 30 mg – 450 tablets | II |
| 22 | 11/17/2011 | K.K. | Oxycodone 30 mg – 450 tablets | II |
| 23 | 8/26/2011 | R.K. | Oxycodone 30 mg – 450 tablets | II |
| 24 | 12/9/2011 | R.K. | Oxycodone 30 mg – 450 tablets | II |
| 25 | 12/19/2011 | J.L. | Oxycodone 30 mg – 360 tablets | II |
| 26 | 1/14/2013 | J.L. | Oxycodone 30 mg – 300 tablets | II |
| 27 | 5/12/2011 | Mr. M.M. | Oxycodone 30 mg – 360 tablets | II |
| 28 | 3/7/2012 | Mr. M.M. | Oxycodone 30 mg – 320 tablets | II |
| 29 | 7/28/2011 | Ms. M.M. | Oxycodone 30 mg – 425 tablets | II |
| 30 | 8/7/2012 | Ms. M.M. | Oxycodone 30 mg – 300 tablets | II |
| 31 | 11/4/2010 | C.P. | Oxycodone 30 mg – 360 tablets | II |

| 32 | 4/8/2011 | C.P. | Oxycodone 30 mg – 360 tablets | II |
|----|----------|------|-------------------------------|-----|
| 33 | 6/16/2011 | M.P. | Oxycodone 30 mg – 400 tablets | II |
| 34 | 11/15/2011 | M.P. | Oxycodone 30 mg – 400 tablets | II |
| 35 | 9/22/2011 | L.R. | Suboxone 4 mg – 60 tablets | III |
| 36 | 10/21/2011 | A.S. | Oxycodone 30 mg – 500 tablets | II |
| 37 | 11/23/2010 | K.S. | Oxycodone 30 mg – 360 tablets | II |
| 38 | 8/29/2011 | K.S. | Oxycodone 30 mg – 360 tablets | II |
| 39 | 11/1/2010 | M.S. | Oxycodone 30 mg – 360 tablets | II |
| 40 | 10/26/2011 | M.S. | Oxycodone 30 mg – 400 tablets | II |
| 41 | 12/20/2011 | D.W. | Oxycodone 30 mg – 300 tablets | II |
| 42 | 7/6/2011 | T.W. | Subutex 8 mg – 90 tablets | III |

(In violation of Title 21, United States Code, Section 841(a).)

## Counts Forty-Three – Forty-Four
### (Aiding and Abetting Health Care Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

178. The allegations set forth in paragraphs 2 through 177 of this Indictment are incorporated herein by reference.

179. On or about the below listed dates, in Stafford, Virginia, within the Eastern District of Virginia, the defendant, NIBEDITA MOHANTY, M.D., unlawfully, knowingly, and willfully aided and abetted D.C. in the attempt and execution of a scheme and artifice to defraud a health care benefit program (Anthem) in connection with the delivery of or payment for health care benefits, items, and services, to wit: by issuing prescriptions not for a legitimate medical purpose and beyond the bounds of medical practice and knowingly causing him to submit claims to Anthem for the cost of DR. MOHANTY's prescriptions.

| Count | Date of Prescription | Date of Submission to Anthem | Issuing Physician | Medication |
|-------|----------------------|------------------------------|-------------------|------------|
| 43 | 11/18/2009 | 11/18/2009 | DR. MOHANTY | Subutex 8 mg |
| 44 | 8/2/2010 | 8/2/2010 | DR. MOHANTY | Subutex 8 mg |

### Acts in Furtherance of the Scheme

180. At all times relevant herein, DR. MOHANTY did not possess a "X" DEA number, nor was DR. MOHANTY authorized for office-based narcotic buprenorphine treatment. D.C. was a patient of DR. MOHANTY and identified himself to DR. MOHANTY as someone who was addicted to heroin.

181. On or about November 20, 2008, in Stafford, Virginia, at D.C.'s first appointment with DR. MOHANTY, DR. MOHANTY's office staff made copies of D.C.'s Anthem insurance card and coverage information, which is contained in DR. MOHANTY's patient file of D.C. On that

date, D.C. also listed Anthem as his primary insurance company on the Patient Welcome Form, and used his insurance to pay for that office visit.

182. On or about November 20, 2008, in Stafford, Virginia, at the first appointment with DR. MOHANTY, D.C. identified himself as someone who was addicted to heroin and sought her treatment for drug addiction and dependence. D.C.'s patient file noted that D.C. last used on November 15, 2008, Subutex is helping, and D.C. is committed to stopping. DR. MOHANTY prescribed 60 Subutex 8 mg tablets to D.C, which contained DR. MOHANTY's DEA number but did not contain a "X" DEA number.

183. On or about February 4, 2009, in Stafford, Virginia, DR. MOHANTY filled out a Prior Authorization of Benefits Form for buprenorphine for D.C. DR. MOHANTY listed the diagnosis as "Narcotic Dependence and Addiction."

184. On or about September 25, 2009, in Stafford, Virginia, DR. MOHANTY issued a prescription, which was dated for October 25, 2009, for 60 Subutex 8 mg tablets to T.W., who at his first appointment, on or about May 14, 2008, identified himself as someone who was addicted to prescription medications.

185. On or about October 26, 2009, in Stafford, Virginia, Dan's Wellness Pharmacy contacted DR. MOHANTY's office about T.W.'s October 25, 2009 prescription for Subutex 8 mg tablets stating that "on Rx it must say as needed for pain since DR. MOHANTY doesn't have a X DEA #." DR. MOHANTY acknowledged receipt of that information by writing "Done" and adding the word "pain" to that prescription. This information is contained in DR. MOHANTY's patient file of T.W.

186. On or about November 18, 2009, in Stafford, Virginia, D.C. had an office visit with DR. MOHANTY. D.C's patient file noted that D.C. "used drugs this week anything with opiod [sic]

ran out of medicine 10th or 9th." DR. MOHANTY prescribed 60 Subutex 8 mg tablets to D.C. The prescription contained the notation "for pain."

187.    On or about November 18, 2009, in Stafford, Virginia, D.C. took the Subutex prescription to Dan's Pharmacy, within the Eastern District of Virginia, to fill, and the prescription was filled. The cost of filling the Subutex prescription issued by DR. MOHANTY was billed to D.C.'s Anthem health insurance.

188.    On or about August 2, 2010, in Stafford, Virginia, DR. MOHANTY called in 3 Subutex 8 mg tablets to the CVS Pharmacy in Fredericksburg, Virginia for D.C. D.C. filled the Subutex prescription issued by DR. MOHANTY, and the cost of filling the prescription was billed to D.C.'s Anthem health insurance.

(In violation of Title 18, United States Code, Sections 1347 and 2.)

## Count Forty-Five
### (Aiding and Abetting Money Laundering)

THE GRAND JURY FURTHER CHARGES THAT:

189.     The allegations set forth in paragraphs 2 through 188 of this Indictment are incorporated herein by reference.

190.     On or about the below-listed date, in Stafford, Virginia, within the Eastern District of Virginia, the defendant, NIBEDITA MOHANTY, M.D., did knowingly engage and attempt to engage in a monetary transaction by through or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is transfer of U.S. currency, such property having been derived from a specified unlawful activity, that is distribution of controlled substances, in violation of 21 U.S.C. Section 841(a).

| COUNT | DATE | BANK | TRANSACTION |
|-------|------|------|-------------|
| 45 | 8/30/2012 | Virginia Commerce Bank | Deposit of $16,000 in cash from drug proceeds for remuneration for services provided for swimming pool installation |

(In violation of Title 18, United States Code, Sections 1957 and 2.)

## Notice of Forfeiture

191.  The defendant, NIBEDITA MOHANTY, M.D., is hereby notified, pursuant to Federal Rule of Criminal Procedure 32.2, that if she is convicted of the drug violations pursuant to Title 21, United States Code, Sections 841(a)(1) and 846 charged in Counts 1 through 45 of this Indictment, the defendant shall forfeit to the United States any property constituting, or derived from, any proceeds defendant obtained, directly or indirectly, as the result of such violation; and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.  Such forfeitable property includes a sum of money equal to at least $100,000 in United States currency, representing the amount of proceeds obtained as a result of the offenses alleged in the Indictment.

192.  Pursuant to Title 21, United States Code, Section 853(p), the defendant shall forfeit substitute property, up to the value of the amount described in paragraph 191, above, if, by any act or omission of the defendant, the property or any portion thereof, cannot be located upon the

exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(Pursuant to Title 21, United States Code, Section 853.)


Respectfully submitted,

Dana J. Boente                                    A TRUE BILL
United States Attorney

*Gene Rossi* 7/22/2014                    _____
Gene Rossi                                        Foreperson
Assistant United States Attorney

*Jennifer Gimbert Ballantyne*
Jennifer Gimbert Ballantyne
Special Assistant United States Attorney

*Nicole Grosnoff*
Nicole Grosnoff
Special Assistant United States Attorney

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.